## EXHIBT A

**AFFIDAVIT IN SUPPORT OF COMPLAINT FOR FORFEITURE IN REM**

I, DEA Special Agent Michael Brooks, hereby depose and state as follows:

1.     On November 1, 2021, at approximately 11:55 p.m., Arkansas State Police ("ASP") Sergeant Rockey Rapert (Sergeant Rapert) stopped a 2018 Nissan Altima traveling westbound on Interstate 40 after he observed a traffic violation.

2.     The observed violation occurred near mile marker #3 of Interstate 40 in Crawford County, Arkansas, and the traffic stop itself was conducted near mile marker #2, which is in the Western District of Arkansas, Fort Smith Division.

3.     Carlos DeJesus Rodriguez (Rodriguez) was the driver of the 2018 Nissan Altima and provided a California Driver's License to Sergeant Rapert.

4.     Miriam Parra (Parra) was the front passenger of the 2018 Nissan Altima and provided a California Driver's License to Sergeant Rapert.

5.     Carlos Roberto Rodriguez-Martinez (Rodriguez-Martinez) was the rear passenger of the 2018 Nissan Altima and provided a Mexican passport, and a U.S. B1/B2 Visa border crossing card.

6.     While Sergeant Rapert was collecting Rodriguez's information, Rodriguez explained the vehicle he was driving was a rental vehicle and provided Sergeant Rapert with a Hertz rental agreement, which showed this vehicle was rented by Rodriguez on October 31, 2021, at approximately 12:42 a.m., at the Raleigh-Durham International Airport location.

7.     Rodriguez explained he and his wife, Parra, flew on a commercial airlines flight from Fresno, California, to Raleigh, North Carolina, to pick up his brother, Rodriguez-Martinez in North Carolina.

8.      Rodriguez explained he, Parra, and Rodriguez-Martinez were driving back to Fresno, California.

9.      Rodriguez stated Rodriguez-Martinez was from Mexico and had been vacationing in North Carolina.

10.     Extensive travel within short amounts of time are suspicious and well outside normal travel patterns, and that this type of travel activity has been used by paid couriers working for drug trafficking organizations.

11.     Sergeant Rapert stated Rodriguez then volunteered that his son was in the U.S. Army, which caught his attention because this statement seemed to come out of nowhere.

12.     This type of statement, invoking military or law enforcement support, when given out of context, is a common tactic used by those involved in illegal activity as a way of shifting the conversation or validating that they are a good person to law enforcement.

13.     Sergeant Rapert then asked Rodriguez if there were any weapons or marijuana in the vehicle, and Rodriguez stated there was not.

14.     Sergeant Rapert then asked Rodriguez if there were any large amounts of currency in the vehicle, Rodriguez stated there was not, and informed Sergeant Rapert he could check the vehicle.

15.     During a search of the vehicle, Sergeant Rapert located a couple pieces of luggage and a small fuzzy decorative pillow in the trunk of the vehicle.

16.     Rodriguez volunteered to open the luggage and began to do so.

17.     As Rodriguez was doing opening the luggage, Sergeant Rapert observed new items of clothing and other new items in the luggage that appeared to have just been purchased with tags still on them.

18.     Sergeant Rapert has personally witnessed several incidents where money couriers found in possession of large amounts of United States Currency were also in possession of newly purchased items, such as clothing.

19.     During the search of the trunk, Sergeant Rapert picked up the decorative pillow, which he observed seemed to be much heavier than it should have been.

20.     Sergeant Rapert squeezed the pillow and felt block-like items concealed within the pillow.

21.     Sergeant Rapert observed there was no zipper to access the inside of the pillow and that the seams were all sewn together.

22.     Sergeant Rapert asked Rodriguez if this pillow was his, and Rodriguez stated he had recently purchased the pillow.

23.     Sergeant Rapert asked Rodriguez how much money was concealed within the pillow, and Rodriguez stated he thought it was $200,000, this after Rodriguez had denied there being any large amount of currency in the vehicle.

24.     Rodriguez stated he received the money from Rodriguez-Martinez's friend in North Carolina, that Rodriguez-Martinez had paperwork justifying this money, and that the pillow had been sewn shut after the money was placed inside.

25.     Sergeant Rapert then located a seam in the pillow and was able to pull it apart revealing numerous bundles of United States Currency, later determined to be $206,000 (the Defendant Property, see below).



26.     The bundles of United States Currency found inside of the pillow were wrapped in bank bands (see below).



27.     Several of these bundles were banded and labeled in one-thousand-dollar increments, and several bundles were labeled in one-thousand-dollar bands but were more than one-thousand-dollar bundles.

28.     Financial institutions will not bundle United States currency in amounts that differ from the labeled banded amount, and doing so is a technique commonly utilized by drug trafficking organizations in an attempt to legitimize the appearance of drug proceeds as United States currency recently banded and labeled by a financial institution.

29.     Those involved in transporting illicit United States currency inside of a vehicle will oftentimes hide and conceal these monies when legitimate United States currency has no reason to be hidden or concealed, which is an indicator that the Defendant Property was derived from an illegal source.

30.     Sergeant Rapert also located a bank-banded, stamped and initialed bundle of United States currency in a handbag in the trunk of this vehicle, which was the only bundle of United States currency that was found during this incident that was stamped and initialed.

31.     The bundles of United States currency found concealed within the pillow were not bundled in the same manner as the bundle found in the handbag, appeared to Sergeant Rapert to be more consistent with United States currency recently labeled by a financial institution, and was not seized by law enforcement.

32.     Sergeant Rapert then advised Rodriguez of his *Miranda* Rights, utilizing Google translate, which Rodriguez indicated he understood.

33.     Rodriguez informed Sergeant Rapert the Defendant Property was money from the sale of his family's property in Mexico.

34.     Sergeant Rapert took custody of the Defendant Property, and Rodriguez, Rodriguez-Martinez, and Parra agreed to travel to the 12th/21st Judicial Drug Task Force (JDTF) office in Van Buren, Arkansas, for further processing.

35.     On November 2, 2021, while at the 12th/21st JDTF office in Van Buren, Arkansas, ASP Trooper Matt Price (Trooper Price) deployed K-9 "Ric" on three empty boxes, with no alert.

36.     While Trooper Price and K-9 "Ric" were out of sight, the Defendant Property was then placed into one of the three cardboard boxes.

37.     Several minutes later, Trooper Price redeployed K-9 "Ric" on the boxes, and K-9 "Ric" alerted in a manner indicative of a positive alert for the presence of illegal drugs on the cardboard box containing the Defendant Property.

38.     On November 2, 2021, while at the 12th/21st JDTF office, Affiant and Van Buren, Arkansas, Police Department (VBPD) Officer John Arredondo (Officer Arredondo) conducted interviews with Rodriguez, Rodriguez-Martinez, and Parra.

*Interview of Carlos DeJesus Rodriguez*

39.     Rodriguez stated he and Parra departed Fresno, California on a commercial airlines flight through Phoenix, Arizona and into Raleigh, North Carolina on October 31, 2021.

40.     Rodriguez stated the purpose of this travel was to pick-up the Defendant Property.

41.     Rodriguez stated the Defendant Property came from a restaurant named "El Tapatio."

42.     When asked, Rodriguez stated he did not know the person who had given him the Defendant Property, other than the name of the person being "Rufino."

43.     Rodriguez stated "Rufino" was the owner of El Tapatio.

44.     Rodriguez then supplied Affiant with a phone number in Rodriguez's cell phone for Rufino Torres (Torres), which was a number ending in 7308.

45.     Rodriguez stated he acquired the Defendant Property from Torres while in the office of the El Tapatio restaurant.

46.     Rodriguez stated that Torres gave him the address to El Tapatio, but then stated that Torres gave the address to Rodriguez-Martinez.

47.     Rodriguez stated the Defendant Property was proceeds from the sale of Rodriguez's mother's home, located at #129 CD Manuel Doblado, Guanajuato, Mexico.

48.     Affiant asked Rodriguez if he had a sales contract for the sale of his mother's home, to which Rodriguez stated he did not, but that a contract was drafted with a notary public in Mexico where it would remain until Torres traveled to Mexico to sign the contract.

49.     Rodriguez stated Torres purchased his mother's home for approximately $450,000.

50.     Affiant asked Rodriguez how much United States currency made up the Defendant Property, to which Rodriguez stated "$200,000."

51.     Affiant asked Rodriguez why this amount was not in the amount of $450,000, and Rodriguez stated Torres had previously travelled to Mexico and paid his mother $50,000.

52.     Rodriguez then immediately changed the amount Torres paid his mother from $50,000 to $25,000.

53.     Rodriguez then changed his statement, stating the entire purchase of his mother's property was not $450,000 but $250,000, that Torres previously travelled to Mexico and paid his mother $50,000, and the remaining $200,000 was the Defendant Property located in the pillow found in the trunk of the vehicle he was driving.

54.     Rodriguez then changed his statement again, stating Torres purchased his mother's residence for $225,000, that Torres previously travelled to Mexico and paid his mother $25,000, and the remaining $200,000 was the Defendant Property located in the pillow found in the trunk of the vehicle he was driving.

55.     Affiant asked Rodriguez why this type of transaction was not conducted through a financial institution, and Rodriguez stated Torres requested that he come to North Carolina to acquire the Defendant Property.

56.     When asked where they were taking the Defendant Property to, Rodriguez stated that they were taking it back to Fresno, California, where they planned to invest the Defendant Property in real estate.

57.     Rodriguez stated on November 4, 2021, Torres was planning on flying to Mexico to sign the final sales contract on his mother's home to make the sale final.

58.     Affiant informed Rodriguez this did not make sense and that was not how the sale of property is conducted.

59.     Rodriguez stated Rodriguez-Martinez could supply Affiant with further details surrounding this transaction.

60.     Affiant then asked Rodriguez who all had an ownership interest in the Defendant Property, and Rodriguez stated the Defendant Property was his.

61.     Affiant asked if the Defendant Property belonged to Parra, and Rodriguez stated no.

62.     Rodriguez then stated the Defendant Property belonged to him and Rodriguez-Martinez.

*Interview of Carlos Roberto Rodriguez-Martinez*

63.     Rodriguez-Martinez stated he currently resides in Mexico, but had come to the United States to sell a property to "Rufino Magana," who utilized a phone number ending in 7308.

64.     Rodriguez-Martinez identified the address of this property as #129 Zona Centro, Manuel Doblado, Guanajuato, Mexico, and indicated that this was his mother's residence.

65.     Rodriguez-Martinez explained that the way a real estate transaction works in Mexico is that all the paperwork is signed first, which is not delivered until the property is paid for in full.

66.     Rodriguez-Martinez stated that the purchase price for the property was 400,000 Pesos but did not know the value in U.S. Dollars.

67.     Rodriguez-Martinez stated he acquired $200,000 in the United States for this property from Magana while inside the office area of a restaurant named "Tapatio" in Rock Mount, North Carolina.

68.     When asked how he knew Magana, Rodriguez-Martinez stated that after listing the property for sale through a real estate agent, Magana's grandson approached him about purchasing the property.

69.     Rodriguez-Martinez stated he departed Mexico on a commercial airlines flight to Raleigh, North Carolina through Dallas, Texas, on October 31, 2021.

70.     Rodriguez-Martinez stated the $200,000 was the total amount from the sale of the property, and that his mother, Maria Guadalupe Martinez-Bautista, owned the property.

71.     Rodriguez-Martinez stated that his mother no longer occupies the property and now lives with him.

72.     Rodriguez-Martinez stated that they planned to use the Defendant Property to invest in real estate in the United States.

73.     Rodriguez-Martinez stated that they learned that they needed special visas to purchase property in the United States, and that Magana was holding the Defendant Property until they could obtain the proper visas.

74.     Rodriguez-Martinez stated that the plan was for Rodriguez to maintain custody of the Defendant Property for safe keeping.

75.     Rodriguez-Martinez stated that the Defendant Property belonged to his mother and that they were just handling the transaction for her.

76.     When asked why they were conducting the transfer of the funds for the purchase this way and not in a more legitimate and secure manner, Rodriguez-Martinez stated that the United States currency is worth more in the United States than it is in Mexico.

77.     Rodriguez-Martinez stated that Magana initially wanted to send the funds via wire, but the conversion rate was too low.

78.     Rodriguez-Martinez explained that had they acquired the Defendant Property in Mexico via wire, they would only have cleared $190,000.

79.     Also, Rodriguez-Martinez stated that Magana gave them an additional $6,000 for traveling to the United States to pick up the Defendant Property, bringing the total amount to $206,000.

80.     Rodriguez-Martinez stated he did not have a copy of the sales contract for this property, that the contract was with a notary in Mexico, and that Magana would receive a copy of the paperwork after traveling to Mexico to sign the contract.

81.     Rodriguez-Martinez provided Affiant with consent to search through Rodriguez-Martinez's cellular telephone.

82.     Rodriguez-Martinez showed Affiant an SMS text message from Magana, from a phone number ending in 7308, supplying Rodriguez-Martinez with the address to the El Tapatio restaurant, where Rodriguez-Martinez claimed to have acquired the Defendant Property.

83.    Rodriguez-Martinez also showed Affiant an SMS text message from Magana, supplying Rodriguez-Martinez with Magana's home address.

84.    Rodriguez-Martinez stated they did not travel to Magana's residence, and that Magana said that they could use that address if questioned by immigration officials.

85.    Rodriguez-Martinez stated he intended to travel back home to Mexico, but at the time, he did not have a return flight scheduled.

86.    Affiant then asked Rodriguez-Martinez who all had an ownership in the Defendant Property.

87.    Rodriguez-Martinez stated the Defendant Property belonged to his mother, but that his mother wanted him to handle the Defendant Property.

*Interview of Miriam Parra*

88.    Parra stated she and Rodriguez departed Fresno, California, on a commercial airlines flight to Raleigh, North Carolina, on October 30, 2021.

89.    Parra stated the purpose of their travel to North Carolina was to pick-up Rodriguez's brother, Rodriguez-Martinez, who was in North Carolina to sell a piece of property to an unknown person.

90.    Parra explained that Rodriguez-Martinez knew the individual involved in the property sale from growing up together in Mexico.

91.    Parra further stated that Rodriguez-Martinez travelled from Guanajuato, Mexico, to Dallas, Texas, and then to North Carolina to facilitate the sale of the property.

92.    Parra stated that her mother-in-law and Rodriguez-Martinez sold the property.

93.    Parra stated the property Rodriguez-Martinez sold was a residential and commercial property near Guanajuato, Mexico.

94.     Parra was not able to identify the purchaser of the property, but Parra had the address of the individual, 1296 N. Weslyan Boulevard, Rocky Mount, North Carolina, which is the address for El Tapatio restaurant.

95.     Parra stated she, Rodriguez, and Rodriguez-Martinez travelled to the El Tapatio restaurant in Rocky Mount, North Carolina to meet with the buyer of this property.

96.     Parra stated after they ate at El Tapatio, she went outside to wait in the vehicle.

97.     Parra stated she believed Rodriguez and Rodriguez-Martinez met with the buyer in the office area of the restaurant to conduct the transaction for the sale of the property in Mexico.

98.     Parra indicated that the owner of the restaurant was the individual who was purchasing the property.[1]

99.     Parra stated after this transaction took place, she concealed the Defendant Property into the pillow.

100.    Parra stated this was the safest way of transporting the Defendant Property.

101.    One-way travel and mixed travel methods are travel activities outside normal travel patterns, and are commonly conducted by those involved in illegal activity.

102.    Here, Rodriguez, Para, and Rodriguez-Martinez all flew to North Carolina via commercial airlines, and were travelling back to California via a rental vehicle.

*Recorded Phone Call to Rufino Torres*

103.    On November 2, 2021, while at the 12th/21st JDTF office, a recorded phone call was placed to Torres, at the telephone number ending in 7308.

---

[1] The owner of El Tapatio restaurant was subsequently identified in this investigation as Torres.

104.    This phone call was made in an attempt to corroborate statements previously given by Rodriguez, Rodriguez-Martinez, and Parra, regarding the facts surrounding the acquisition of the Defendant Property.

105.    During this call, Officer Arredondo translated Affiant's questions and acted as a Spanish-speaking translator.

106.    During this call, the user of this cellular telephone confirmed their name to be "Rufino."

107.    Affiant introduced himself to Torres as being an agent with the DEA, explained to Torres the reason for the call, and asked if Torres would speak to Affiant, to which Torres agreed.

108.    Affiant asked Torres if he remembered giving money to anyone recently.

109.    Torres stated he did remember this, and that it occurred on Sunday (presumed to be October 31, 2021).

110.    Affiant asked Torres how much money he gave to these people, and Torres replied, "It was a little bit more of 200."

111.    Affiant asked Torres what was the money for, but Torres did not answer this question.

112.    When Affiant asked again what the money was for, Torres still would not answer this question.

113.    Affiant asked Torres who he gave this money to, and Torres stated, "I gave it to Beto."

114.    Affiant asked Torres if "Beto" was Torres's friend or a relative, and Torres stated, "He is just an acquaintance; I just gave him the money for some property."

115.    Affiant knows "Beto" to be the nickname Parra had in her cellular telephone for Rodriguez.

116.    Affiant again asked Torres how much money he gave to "Beto," and Torres replied, "I think it was about 200."

117.    Affiant asked, "200?", and Torres replied, "A little bit more than 200."

118.    Affiant asked Torres where he met with "Beto" to give him the money, and Torres stated, "It was at my house."

119.    Affiant asked, "Beto went to your house?" and Torres responded, "uh-huh," meaning in the affirmative.

120.    This statement was contrary to the statements provided by Rodriguez, Rodriguez-Martinez and Parra, who said they had acquired the Defendant Property while at the El Tapatio restaurant.

121.    Affiant then asked Torres for the address to Torres's residence, and Torres refused to give Affiant the address to his residence.

122.    Affiant asked Torres if he had a restaurant, and Torres stated, "No."

123.    Affiant again asked Torres if he had a restaurant, and Torres again stated, "No."

124.    Torres's claim he did not own a restaurant was contrary to the statements by Rodriguez, Rodriguez-Martinez and Parra, that Torres owned the El Tapatio restaurant.

125.    Affiant then asked Torres what property did he give the money for, and Torres then began telling Affiant he could no longer hear Affiant over the telephone call.

126.    Affiant asked Torres, "Can you hear me?" and Torres replied, "No, I can't hear you."

127.    Soon after, the phone call was dropped unexpectedly.

128.    Immediately afterwards, Affiant attempted to call Torres back at the same cellular telephone number with negative results.

129.    As mentioned above, the statements provided by Rodriguez, Rodriguez-Martinez, and Parra, differed from Torres's statements as to where the transfer of the Defendant Property occurred.

130.    Furthermore, Rodriguez stated Torres owned a restaurant in North Carolina, which conflicted with Torres's statement during the recorded phone call.

131.    Conflicting statements were also observed when Parra initially denied ownership of the Defendant Property, but later claimed to having ownership of the Defendant Property.

132.    These types of conflicting statements are an indicator of illegal activity.

133.    On November 2, 2021, based on the above facts, Affiant seized the Defendant Property.

*Administrative Forfeiture Proceedings*

134.    The DEA then began administrative forfeiture proceedings to forfeit the Defendant Property.

135.    On January 26, 2022, Rodriguez and Parra filed a claim to the Defendant Property in the administrative forfeiture proceedings.

136.    In his claim, Rodriguez stated, under penalty of perjury, that he had an interest in the Defendant Property because, "[o]wnership of the assets were obtained legally without felonious conduct."

137.    Rodriguez's ownership claim was contrary to his prior statements that the Defendant Property was proceeds from the sale of property owned by his mother.

138.     In her claim, Parra stated, under penalty of perjury, that she had an interest in the Defendant Property because, "[o]wnership of the assets were obtained legally without felonious conduct."

139.     Parra's ownership claim was contrary to her prior statements that her only tie to the Defendant Property was having sewn the Defendant Property into the pillow.

140.     On January 27, 2022, an attorney filed a claim on behalf of Torres stating:

> I am an attorney representing Mr. Torres. I understand that Mr. Torres furnished the seized funds to the individual from whom the funds were seized in connection with a real estate transaction. I understand that Mr. Torres has not yet received confirmation that the real estate transaction has closed and that the contemplated sale has been finalized. Unless and until the real estate transaction in question has been fully consummated, Mr. Torres has a cognizable interest in the seized funds, including, without limitation, as their owner.

141.     On February 2, 2022, the DEA received a claim from Maria Guadalupe Martinez Bautista (Bautista).

142.     In Bautista's claim, made under penalty of perjury, Bautista stated:

> Ownership of the [Defendant Property] was obtained legally without any felonious conduct on Claimant's part. By virtue of said ownership, Claimant Maria Guadalupe Martinez Bautista in [sic] lawful owner of seized property herein on December 23, 2021, when said claimant was wrongfully deprived thereof by agents of U.S. Government, namely agents of the Drug Enforce [sic] Administration. Claimant Bautista was the Seller of a Property located in Mexico which was Purchase By Rufino Torres Garcia A Us [sic] Base Business man [sic] who purchase the property for $206,000.00 in cash which is the Property Seized herein. … Additionally, Ms. Bautista resides in Mexico but has a USA Tourist Visa.

143.     On April 6, 2022, the DEA received a claim from Rodriguez-Martinez.

144.     In his claim, Rodriguez-Martinez stated, under penalty of perjury, that he had an interest in the Defendant Property because, "[o]wnership of the assets were obtained legally without felonious conduct."

*Initial Contract Provided to the Government*

145.     Rodriguez also filed a Petition for Remission/Mitigation on January 26, 2022.

146.     Included with the Petition were documents in Spanish, one of which was titled "CONTRATO PRIVADO DE COMPR-VENTA," which translates to "PRIVATE PURCHASE-SALE CONTRACT."

147.     The documents purport to be a contract between "MARIA GUADALUPE MARTINEZ BAUTISTA" and "RUFINO TORRES GARCIA," for the purchase of property described as "urban property 129 on Hidalgo Street in Manuel Doblado City, Guanajuato" for the price of 4.5 million Pesos, with $500,000 Pesos to be paid at the time of signing the contract and 4 million Pesos to be paid on October 31, 2021.

148.     The contract also authorized Rodriguez-Martinez to receipt the money on Bautista's behalf.

149.     The contract is purportedly signed by Bautista and Torre`s, and witnessed by two other individuals, but is not dated.

*Second Contract Provided to the Government*

150.     On January 16, 2023, counsel for Rodriguez, Parra, Rodriguez-Martinez and Bautista provided the Government with an additional document relating to the sale of the above-referenced property to Torres.

151.    These documents are dated November 18, 2022, more than a year after the seizure, and purport to show an agreement for Torres to purchase the property from Bautista for 4.5 million Pesos to be paid by February 8, 2023, by "transfer check" and not by U.S. currency.

152.    It is common for money couriers to be provided specific instructions about what to say to law enforcement about the source of the funds, and that criminal organizations generate falsified documents to support an explanation provided by the money couriers.

153.    Affiant has personal experience with a money courier, traveling from North Carolina, initially claiming, as is being claimed here, that the U.S. currency they were transporting was proceeds from a real estate transaction for real estate in Mexico, only for them to later admit that the true source of the funds were from the sale of illegal drugs.

154.    Affiant believes that the documents provided relating to the sale of property in Mexico are fraudulent and were generated in an attempt to corroborate the explanation given for the source for the Defendant Property.

*Nexus between Rodriguez, Torres and Drug Trafficking Activity*

155.    In this investigation, although there was a dog alert for the presence of narcotics, no known illegal drugs have been seized.

156.    However, analysis of Torres's phone tolls show him to have been in telephonic contact with targets of past and/or present drug investigations by the DEA.

157.    The telephonic connections identified in this case, and described below, is indicative of drug-related criminal activity.

158.    Sophisticated drug trafficking organizations can be composed of various compartmentalized groups (cells) assigned with specific functions all working for the same drug trafficking organization.

159.     These cells are organized, overseen, and directed by coordinators, whose primary responsibility is the successful function of the cell that they control.

160.     The coordinator reports all successes or failures to higher leadership within the drug trafficking organization.

161.     It is common to find a coordinator (like the person responsible for money movement) to be in contact with and actively monitoring and managing multiple money couriers at the same time.

162.     Toll record analysis of Torres's cellular telephone number ending in 7308, and Rodriguez's cellular telephone number ending in 3597 for the period between September 2, 2021, and November 2, 2021, show Torres and Rodriguez were in contact with phone numbers that have been previously identified by other DEA investigations as engaged in criminal activity.

*Target Phone A*[2]

163.     During the aforementioned timeframe, Torres was in contact with Target Phone A, the user of which has been identified by DEA agents as a money launderer of drug proceeds.

164.     Agents have identified that the user of Target Phone A specializes in the laundering of drug proceeds through several restaurants in North Carolina.

165.     Agents have also conducted controlled purchases of illegal drugs from one of these restaurants, where the user of Target Phone A was known to be a manager at the time of the controlled purchases.

---

[2] To maintain the integrity of the other DEA investigations, Affiant refers to these phone numbers as "Target Phones."

*Target Phone B*

166.    During the aforementioned timeframe, Torres was in contact with Target Phone B, who was in contact with a subject identified as a Mexico-based supplier of heroin.

*Target Phone C*

167.    During the aforementioned timeframe, Rodriguez was in contact with Target Phone C, the user of which is believed to be the brother of a large-volume marijuana distributor with drug ties to California.

168.    Target Phone C was also in contact with an associate of a known drug proceeds collector in Fresno, California.

169.    Rodriguez, the above-mentioned driver of the vehicle, was residing in Fresno, California at the time of this seizure.

170.    Additionally, California is a source state for illegal drugs, and source states act as collection points for drug proceeds prior to these proceeds being smuggled back to the drug suppliers based in Mexico.

*Target Phone D*

171.    During the aforementioned timeframe, Rodriguez was in contact with the user of Target Phone D, who was identified as a transporter of cocaine from California to New York.

*Money Laundering and the Transportation of Bulk Cash*
*Derived from the Sale of Illegal Narcotics*

172.    Drug trafficking is a cash-based trade.

173.    Drug trafficking organizations need to find ways to introduce the cash from the sale of illegal drugs into the financial system so that those higher up in the drug trafficking organization can acquire assets and real property without spending large sums of cash, which might attract the attention of the financial institutions involved or law enforcement.

174.    In the United States, bulk drugs exported from Mexico typically are staged in cities and towns in Southern California and along the Southwest border.

175.    The further East that those bulk drugs transit from their point of origin, the higher the sale price increases.

176.    Because drugs are traditionally sold for cash, the bulk cash from the sale of drugs typically travels from East to West by money couriers, back to the point of origin.

177.    Money couriers are often provided an address and or contact number where they are supposed to travel to in order to take possession and transport back drug proceeds.

178.    Often times, by design, the money courier will not be provided additional details in an effort to protect the drug trafficking organization if contacted by law enforcement.

179.    Money couriers may be provided specific instructions about what to say to law enforcement about the source of the funds.

180.    Sources of supply for the drugs often contract with drug money laundering organizations for an agreed upon fee to have the drug proceeds laundered through various bank accounts at various financial institutions, and some of those funds are also transported as cash by money couriers.

181.    Drug money laundering operations often introduce drug proceeds into financial institutions by depositing cash and/or "cash equivalent" (cashier's checks, money orders, third party checks, etc.) into accounts with legitimate funds.

182.    The legitimate and illegitimate funds are comingled in business accounts as part of the "concealment" prong of a money laundering operation.

183.    Drug money laundering operations use "front companies" to deposit the drug proceeds in an attempt to legitimize their ill-gotten gains.

184.    Common examples of "front companies" include, but are not limited to: restaurants, retail stores, liquor stores, cigarette distributors, privately owned automated teller machines, vending machine operators, and parking garages.

185.    Round-numbered amounts of cash deposited into financial institutions is a significant indicator because bulk quantities of narcotics are often exchanged for bulk-banded amounts of currency.

186.    Bulk-banded currency refers to the manner in which bulk cash is banded in thousand or multi-thousand-dollar increments, which facilitates a quick count in a public area when drugs and money are exchanged.

187.    Although the amount of bulk-banded currency is not standardized, this money packaging process is consistent among drug trafficking organizations because it allows the money courier and/or the drug courier to quickly confirm the amount of money received without the laborious and time intensive efforts required.

188.    The depositing of these round numbered cash amounts into "front" company accounts is standard money laundering practice.

189.    In addition, at times, bulk cash is required by the drug trafficking organization for various reasons, many of which involve the ongoing financing of the drug trafficking organization.

190.    Title 31, United States Code, Section 5313 and 31 C.F.R. Chapter X, Part 1010.311 of the Bank Secrecy Act ("BSA") require that any financial institution that engages with a customer in a currency transaction (i.e., a deposit or withdrawal) in excess of $10,000 to report the transaction to the Department of the Treasury.

191.    These regulations also require that multiple transactions be treated as a single transaction if the financial institution has knowledge that they are by, or on behalf of, the same person, and they result in currency either received or disbursed by the financial institution totaling more than $10,000 during any one business day.

192.    Many individuals involved in these illegal activities are aware of such reporting requirements and take active steps to attempt to cause financial institutions to fail to report them.

193.    These active steps are often referred to as "smurfing" or "structuring" and involve dividing a sum of money greater than $10,000 and making multiple cash deposits, in amounts less than $10,000 in order to avoid the reporting requirements.

*Structuring Activity in Account Controlled by Torres*

194.    In the course of this investigation, Affiant learned that "Rufino Torres" and "Luis A Carrera" were listed on the business resolution for a business checking account ending in 2990, opened on January 30, 2019, which was held by Branch Banking and Trust Company Bank in North Carolina in the name of Tacos Y Pupusas, Inc.

195.    Analysis of this account revealed consistent structuring activity over a long period of time.

196.    Specifically, Affiant observed cash deposits in amounts that were just shy of the reporting threshold, with none of the cash deposits exceeding the reporting threshold as further detailed below.

197.    Also, the majority of these deposits occurred within one banking day of another cash deposit.

198.    Between April 19, 2019, and June 24, 2019, the total amount of structuring activity was $154,265.

199.    Between June 26, 2019, and September 18, 2019, the total amount of structuring activity was $141,962.

200.    Between October 4, 2019, and December 16, 2019, the total amount of structuring activity was $163,272.

201.    Between December 20, 2019, and March 16, 2020, the total amount of structuring activity was $197,850.

202.    Between March 20, 2020, and June 17, 2020, the total amount of structuring activity was $78,560.

203.    Lastly, between June 22, 2020, and September 10, 2020, the total amount of structuring activity was $143,098.

204.    The total amount of structured cash deposits into the account associated with Torres was $879,007 over a period of approximately 17 months, the source of which is unknown.

205.    The above-detailed structuring activity is consistent with drug proceeds money laundering.

206.    Based upon the facts detailed herein, namely the circumstances of the traffic stop, the manner in which the Defendant Property was concealed, the conflicting statements of Torres, Rodriguez, Rodriguez-Martinez and Parra, the telephone toll analysis, and Torres's structuring activity, it appears that Torres is depositing cash proceeds of drug trafficking into a business account, giving the proceeds the appearance of revenue from legitimate business activity, then withdrawing the laundered proceeds for transport back west by money couriers.

Michael Brooks
Special Agent
Drug Enforcement Administration

Subscribed to and sworn before me this 21ᵈ of March, 2023.

State of Arkansas            )
County of Sebastian          )

Before me, the above authority personally appeared, Special Agent Michael Brooks, who having produced his DEA credentials as identification and having being duly sworn, states that the foregoing is true to the best of his knowledge, information, and belief.

Witness my hand and official seal on this the 21ᵈ day of March, 2023.

*Bonita Byers*                                              (seal)

Notary Public
Commission Expires:


BONITA BYERS
Notary Public-Arkansas
Sebastian County
My Commission Expires 07-21-2032
Commission # 12719685